13-12-12 AMDOCS v. OPENET TELECO 1. The District Court adopted a claim construction for the terms enhance and completing that was neither party asked for and that was in error. 2. The District Court made new factual findings about the OPENET-accused products that, again, neither party asked for in the District Court and again was in error. 3. In contravention of Rule 56F, the District Court granted summary judgment on these new bases without giving AMDOCS notice and an opportunity to respond. 4. In its red brief, OPENET spends only a few pages attempting to defend the District Court's opinion. 5. Instead, it urges an alternative argument that the District Court did not adopt, namely its DSD-scripts argument. I'd like to ask a question. My understanding is that in this case, the District Court judge rendered her summary judgment ruling at the same time she made her claim constructions? That's correct. And my understanding is that the parties consented to that procedure? That is correct. So I think part of your problem is you say, gee, we didn't know until we read the opinion that we were going to get stuck with enhancement with the interpretation that leads to an architecture. And so we were sort of blindsided in a way. Now, if you allowed the District Court to conspire the claims and roll it up in the summary judgment at the same time, then can you cry foul? Well, in this case, the court did have claim construction and summary judgment at the same time. And I won't necessarily guess the policy from the District Court, but I believe that a lot of district judges do want to have summary judgment and claim construction at the same time. So they have context for the claim construction. And so in this case, that was the procedure, the normal procedure in the Eastern District of Virginia. And so the reason that we were, in a sense, blindsided is because the court did adopt a construction that neither side asked for. The federal circuit has stated… But that's not against the law. That is not against the law. It's not favored, but claim construction is an issue of law, and the district courts are tasked with the responsibility of construing the claims. However, what the court then did is made factual determinations that the OpenNet products did not operate in this, what she called a distributed enhancement type of situation. And so what the court did was went further than just construing the claim terms to give them new meaning. But then also made factual findings regarding the OpenNet products that, again, neither side asked for. The issue of whether enhancement needed to be distributed or not was not an issue that was raised by OpenNet. I'm looking at page 57, 58 of your brief where you cite what you believe to be the evidence that gives rise to a material issue disputed fact with regard to the system. On the first two of those references, 2970 and 3188, I checked. Those are supported by exhibits that are in the record, the PowerPoint and the Canadian. I couldn't find any for the bottom, the next one, two, three, four, five, of those references, I couldn't find any indication that those things were in evidence in front of the district court. The exhibit numbers? That is correct. They were not, the additional evidence that's cited on pages 57 and 58 after those first two bullets were not before the district court. And so we've put these into this brief and into the record before this court in support of our Rule 56F argument. Essentially that if we were on notice that the issue of whether there was distributed enhancement that was required under the claims and that it was a basis now for a summary judgment decision, if we were on notice, we would have been able to supply this additional evidence. So what I believe we've shown... I get the feeling that your main concern here is you think the district court missed your FinJEN argument. I believe that that is the main point that we believe is... We're talking about the Beauregard claims right here. We're not talking about the method claims. And we're talking about whether the Beauregard claims are capable of infringing. And you're citing FinJEN and you've got a couple of other cases. That's right. Going back to fantasy sports, FinJEN... Even if the district court judge was right that the PowerPoint presentation that was made doesn't show distributed architecture, you say so what? You believe that the system is capable of being configured in that way. I believe that's right, although I think we've taken it one step further. We've shown both that the system is capable of being configured in that way. We've also shown that the code claims, the code for collecting records, the code for correlating records, the code for enhancing records in the 065 patent, for example. That code does not exist in DSD scripts as OpenNet has argued, but instead exists on that FusionWorks framework CD. And so, yes, it's not just that there's capability. Is this issue argued below? The issue of DSD was argued below. So I've tried to keep them separate in our briefs only because I believe that really they are two separate issues. The issue of whether... You're arguing the FinJEN argument in the papers on the summary judgment motion. And at the hearing on the summary judgment motion, you argued that you were entitled to relief under FinJEN on a capable of theory. That's correct. That's correct. So we argued FinJEN below and the issue of capable of infringing, that was argued below. The issue of whether or not the claims were required that the enhancement be on a distributed basis, that was not argued below. And then the issue of whether or not their claims are... Sorry, their accused product is even capable or is capable of or, in fact, does practice distributed enhancement. Again, that issue was not directly argued below. Instead, what was argued below was the argument that OpenNet again makes in its red brief here and that the court, we believe, did not adopt. And that was simply that we were required to come up with DSD scripts. We were required to identify DSD scripts and that we didn't. Our response below was that no, we're not required under FinJEN, under Versada, under Fantasy Sports, under the apparatus claims. We're not required to show DSD scripts because the code, the infringing code is not these DSD scripts which are typed into the computer afterwards to configure this FusionWorks product to work. One problem, we're in open court today, right? And we're talking about lots of things that are highlighted in these briefs as being confidential. Yes. So maybe at some later stage you can sort of tell us how we could possibly write an opinion here with everything that's been blocked out. I think we... At a later stage. Okay. My understanding is, your theory is that the CD that sold for $100,000 has a huge amount of information on it. It's capable of doing all sorts of things. That's correct. And so the client says we're happy to have that. Now we have particular needs. And so the DSD, you think, is like the key in FinJEN. That is correct. It's what unlocks the system. And so your view is that since all of the information that's capable, I assume you even argue that the basic information on the CD allows the capability of having distributed architecture. That's correct. If you want to wire it up that way. You can either have tunnel, you can either have all the information being done at the hub, or you can have it being done at the edge and then pushed into the hub. That's right. We've shown, I believe, not only capabilities, but actual implementations in the United States for Verizon, for Singular, for others. And we've shown figures, for example, on page 28 of our blue brief and page 18 of our reply brief. And as you noted, what we've shown is that the DSD scripts unlock, as you say, the capabilities of the FusionWorks CD. And we've provided you a quiff from OpenNet's own chief technology officer that states all the code for recognizing each of the DSD commands and performing the task that the command is defined to perform is present on the frameworks installation CD, the accused product in this case, at the time it's delivered. And so all of the code for performing any DSD command is already there. It's just waiting to be, like in Fusion, unlocked. Well, that's the specific function. That's a different question from the architecture. The architecture, the code for a distributed architecture is on that CD at the time it's delivered. Oh, you're telling me that. I don't know that as a matter of fact. It's not just me, but we've shown evidence, and the jury would be able to find from MDAC's own, I'm sorry, from OpenNet's own technical specifications from their, the admissions of their own. That assumes that when they use the word distributed deployment scenarios, et cetera, in their campaign papers, that they mean the same thing that the district court said is required. Right. Although, as you pointed out. A further question, even if OpenNet says we have distributed architecture, you have to know what they mean by that. That's correct. Although, you cited. By distributed, they mean one CET in Chicago and one in Minneapolis. Right, but that is distributed. That would qualify under the district court's definition. We showed a Verizon implementation, for example, and this is in our brief, and it is highlighted, but we did have a conversation with OpenNet's counsel, and so we're allowed to say this in this court. We have shown an implementation, for example, in Verizon where the correlation is distributed between New Jersey, Texas, and California. Again, the reason is so that the correlation can be close to the source. So, even under the court's construction for distributed enhancement, we've shown that distributed enhancement. We've shown, you cited, or you called attention to the first two sites on page 57, but on page 57, that second site says FusionWorks collectors, quote, reside close to the network elements from which they collect. So, it's not our attorney argument only about whether they're OpenNet distributed system, which they call a distributed system. But they can reside close and not do anything. They can reside close and just collect information and shove it all to the hub. So, I mean, you have to have things that are residing close to what it is you're looking at in order to be able to count them. Well, that's correct. But the mere fact that, like I was going to say, that I think there's another level of complexity underneath this distributed concept. What I believe we're talking about, in a sense, is that there are fact issues here to be decided. There are fact issues within OpenNet's own product, from their own admissions, that we believe a jury would be more than capable of determining that there is distributed enhancement, even if that is a requirement. And as we said, we don't want that. Is it fair for your court to have responded to your FinCEN argument? Well, I think… I mean, it looked to me as if the district court judge is saying you haven't produced any evidence that the system is actually doing it as opposed to being capable of doing it. The court did not. We cited FinCEN to the court. The court did not cite FinCEN in its decision, although I believe it's fair to say the court implicitly accepted our FinCEN argument. And that's because it felt the need… It rejected your argument? No, I believe it accepted it in this sense. It felt the need to come up with this new claim construction, this distributed architecture requirement. If the court simply felt that we had not satisfied the requirements… Right, and that would just beg the question of whether or not the architecture is embedded already and is capable of. Right. I think all I'm saying here is that the court came up with what we believe was a new basis for ruling on summary judgment. And that was because under FinCEN, it was not able to say. In a sense, it was not allowed under the law to say that the claims aren't practiced in the United States, and therefore, they're not infringed. Under FinCEN, the claims, especially those that contain code for forming particular functions, those claims are infringed when the CD is sold, offered for sale, or used in the United States. That contains that same code for infringing. Let's hear from the other side, and we'll save you rebuttal time, Mr. Walters. Okay, thank you. Mr. Walters. Good morning. This is a very unusual software patent case in that there was not a presentation of evidence by the patentee in the traditional form of having claim charts, element by element, pointing out admissible evidence that would either prove or at the very least create an issue of fact as to whether that element was there. Instead, they relied on PowerPoints about what some salesman proposed to happen in Poland, Africa, or Canada. Well, that evidence would be admissible at trial, wouldn't it? It would be admissible at trial if it proved anything, but it was not proving... Their argument is what they think it shows to prove is that the system is capable of being instructed to meet the limitations of the claim. And where they fail, it's attorney's argument that it's capable. There is no admissible evidence that it is capable. Why is that not enough?  Just a showing that the fusion work pen is capable of performing what you claim it's going to perform. Because we have sworn admissible testimony that it's not capable. They have only attorney's argument. Where is your sworn testimony that it's not capable? It's Mr. Hogan's declaration. Tell me exactly where. Where in the record? It's Hogan's declaration at page A586 and 87. 586 and 87. The Wang declaration at 48, 38, and 40. 586. 484 and 586, 87 is our statement that it's not capable. Is it then paragraph 9? Paragraph 6, the framework is not a stand-alone product. That's not relevant. Paragraph 6. That's not relevant, the fact that it's a stand-alone product. If it's a stand-alone product, it's capable of being configured to meet the limitations of the claim. That's the question, sir. Paragraph 8 requires the DSD, specific DSD. Sure, everybody admits that. They say, of course. The DSD is what triggers. It's the button that tells them to do it. But the question is whether or not the disk as sold is capable, is capable of being configured in such a way by a DSD to meet the limitations of the claim. And the disk as sold is like an operating system. If your owner buys a computer with Windows operating system, and you want to type a Word document, you've got to have additional applications. I understand that, but the DSD doesn't rewrite any of the code that's on the disk. The code that's on the disk is like saying, well, I got the Gutenberg Bible, and I put it on a disk. The DSD doesn't change any of that code reflecting the Gutenberg Bible, but the DSD can tell you which chapter and verse to look at. And it can tell you whether to look at it perhaps in German or in English or in French or in some other language, right? Well, in paragraph... I'm just coming back. You made a flat-out assertion that there was unquestionable testimony that this thing is not capable. The disk is not capable, right? So I'm just looking at the first site, 586, 587 doesn't do the trick. Well, paragraph 11, Mr. Hogan says that you have to have DS code to perform the mediation. Everyone, everybody admits you have to have the code. But the question is whether or not you can put in the code. Let's say, for example, a customer, just for purposes of argument, let's assume that Sprint took a look at this record and they said, gee whiz, I don't think I want to do business with OpenNet because their thing doesn't have hub-and-spoke architecture because that's what the district court said. And they said, we only want to buy, we only want to play with you if you can have hub-and-spoke architecture for our Sprint system. And the question is, could you write a DSD that would make the basic information on the disk create a hub-and-spoke architecture? They have offered no admissible evidence that would even create an issue of fact that that would be capable. Well, look at page 57 of their week where they say, you've got OpenNet's document that say you function a distributed solution, you reside close to network elements, and then the other pieces of information which they cite, right, which they very candidly have admitted is not yet in evidence, but in your reply brief you do not object to those other citations of evidence as not being in evidence. They do have documents that Your Honor is quite correct. They have documents that use the word distributed and Judge Brinkema, in footnote 8 of her opinion, which is on page 826, recognized that there are two different meanings of distributed. When my colleague talked about Verizon having facilities in New Jersey and Texas and wherever, that's parallel computing. Verizon apparently doesn't have a building big enough to do it all in one building. No, distributed geographically. Exactly, parallel computing. Rather than do all the computing for an entire nationwide system in one location, they've got three locations. That's different from distributed as used in the claim, in the claim construction and as used by Judge Brinkema as she correctly points out in footnote 8. But Your Honor, if I may suggest that in a sense, this whole distributed issue is a red herring because at most that narrows the claim. The claim, and if I can just pick claim 1 of the 065 patent by way of the example, it calls for the enhancement of a record, to create records and enhance records. For example, if Judge Newman starts an internet session, the system will create a record. Customer Newman started an internet session at 10 a.m. When she finishes that at 10.05, it will create a second record that says, Customer Judge Newman stopped her internet session at 10.05. What the 065 patent calls for. Because this was at a time when computer memory was scarce and expensive. As a way to save memory space, the claimed invention says, All right, I've got a start time and I've got a stop time for Judge Newman. We've got to somehow take those two pieces of data and putting it into something meaningful to build the customer. What the 065 patent calls for is to take the stop time from the second Judge Newman record, transport that into the first record, and enhance the first record, which will then, in one record, have the start time and the stop time. There is sworn testimony that OpenNet does not do that. OpenNet is not capable of doing that. Where is that sworn testimony? Who is that? That would be Mr. Gang. Was that in our record? That is in your record. Can you give me the citation? I didn't see that in your brief. It's generally in the Hogan and Dada Wang exhibits, and it's at 4838 and 4840 of the record. The difficulty I had with the case is that your argument is, Well, there's no showing that there's a DSD being sold in the United States, and therefore, you know, that's the way it all works. It didn't seem to get there with me. The argument that I saw was being made was this rather unusual infringement argument that's based on capable of. It starts back with Intel. It was the first case. Judge Archer was 1986, I think it was. And there's a whole line of cases that deal with these so-called Beauregard claims that are these computer disks that got the staff on and say, Well, if it's capable of doing the trick, if all you have to do is switch it on, like in FinGen, on-off switch, then it's going to be an infringing device. If you have to rewrite the code, if you have to do something sexy to the thing, then that's not enough, and it won't. And we have that issue in this case if it went back to remake. The question is how much has to be done to the basic CD. But I didn't see you joining that issue in your brief. You kept arguing because there's no DSD, there can't possibly be any infringement. Well, their expert, Dr. Zagora, admitted in her opening report, which is in the record, that the functionality is in the DSD code. And as I say, there's an absence of... That's what turns it on. It's like the functionality of a key that's something that turns on a piece of equipment. The actual functionality. Now, the closest they came to raising a disputed issue is after we filed our expert report saying we don't have the functionality anywhere, either in the DSD or in the disk. We had sworn testimony that we do not have that functionality. They then filed a supplemental report from Dr. Zagora where Dr. Zagora attached a number of items of DSD code asserting in a claim chart that here's where the functionality is, this line of code, this line of code, this line of code. We pointed out that when they attached that to their summary judgment papers, that it was not sworn to. We filed a motion to ask Judge Brinkman to strike it because it was not sworn testimony capable of raising an issue of fact under Rule 56. Instead of filing a declaration affirming that she believed that was true, they just defaulted on that, and Judge Brinkman correctly said, I cannot consider unsworn testimony, unsworn assertions from an expert who won't swear to it under Oak. And so there's an admission that this functionality, it's not a matter of being an on-off switch. It's a matter of having to have code, it's like the Word application or the Excel application which are necessary additional software to make your operating system... And it seems to me that this is a central question to the case, correct? It is, it's a failure of proof. But it's a question that was never answered. And here we are today, we're still discussing whether this capable of issue, and that seems to me to be a material issue that's in dispute. They have no admissible testimony that has been proffered to Judge Brinkman that says it is capable of. What do they have in their reply brief? Back up just for a second, because part of the argument that your adversary is making is that they were making their spin-gen argument, their capable of argument, they don't know the claim construction, they don't know that they're going to have an architecture problem until they read the summary judgment opinion. They don't, because of the way the case is postured, they don't know that the problem that they have is that the PowerPoint that they showed did not show the hub-and-spoke architecture according to the judge. And they're saying, well, you know, if that's how we're being, if this case is going down on whether or not the accused CD is capable of being operated in such a way as to have the correct hub-and-spoke architecture, then we're entitled to a trial. We're entitled to bring forth facts. That's what, in page 57 of their brief, they've admitted the bulk of their evidence about having a distributed architecture, potential distributed architecture, they haven't put in yet. Well, and as I suggest, Your Honor, that's a question of whether what we do is out at the spoke or in the hub. But they've still got to show that wherever we do it, we do what is precisely called for by the claim. In the example I gave with taking data from the second record to enhance the first record, they didn't even put in admissible evidence to raise the fact that we were performing that data manipulation, regardless of where in the system it was performed. Weren't the marketing materials enough that they put in the record? The marketing materials are sales pieces. They do not explain the precise nature of what is done. Can't they describe capabilities? To be sure, we're capable of manipulating data in a phone system. There's no question about that. But these claims talk about very specific ways of manipulating data, taking this record, taking a piece of data from that record and putting it in that data. The salesman's PowerPoints don't get anywhere close to that. An interesting example would be this court's recent decision in Versada versus SAP. Again, a software... That's a case your adversary is citing as favorable to them. And I cite it as favorable to me, and I'm glad they put it in their brief. It was just decided recently, as your Honor knows. In that case, you had experts on both sides who went through and analyzed line by line the software code that was in dispute. And to find... It was after a trial, wasn't it? After a trial, but it's the same standard. Do they have admissible evidence to create an issue of fact to justify a trial? And what both sides did was explain the capabilities and the actual functions that were performed. And it was interesting in that case, the undisputed testimony was not only was the SAP software as delivered to the customer capable of performing the patented functions, there were actually notes from the software authors contained in the software telling the customer how to perform the patented functions with the software as delivered. That's a far cry from a PowerPoint talking about what might happen in Poland, which is not really probative of anything. So, it's interesting that they knew they had to show software would perform these functions. At the last minute, they did the supplemental report of Dr. Zagora. They failed to put it under oath. Judge Brinkema struck it. They do not appeal Judge Brinkema's opinion striking that. Although they do cite an unpublished opinion from I think it's Texas or Louisiana where the district court relied on an unsworn report, but when you go read that unpublished opinion, what happened was after the complaining party moved to strike the report because it wasn't sworn to, the moving party filed a declaration. Come back to the concern that I have, sir. I understand what you're saying. And you say, well, at the time Judge Brinkema rolls up her summary judgment and claim construction, she reaches the conclusion that Amdoc simply hasn't produced enough evidence to show that the disk is capable of infringing. They cite the four pieces of evidence, throw out the Canadian stuff, look at the PowerPoint, and say, they haven't shown me enough. Even if that is so, what do you make of what's your response to the argument that Amdoc said, look, it wasn't fair to us. We didn't really know that we were going to be hoisted by the architecture argument until after we read the opinion. I have several responses to that, Your Honor. Number one, it should not have been a surprise to them because if you read the specification of those first three patents, that is the principal argument for patentability. So the fact that Judge Brinkema would latch hold of that and they actually disparage the old pipeline system of sending all the raw data to a central hub, so they shouldn't have been surprised. Secondly, if they truly were surprised and if they truly had admissible evidence that could have created a disputed fact, they could have said to Judge Brinkema, who was very patient with them, gave them several chances on summary judgment. They could have said, Judge Brinkema, you've surprised us. We want an opportunity to submit another declaration. We think we can create an issue of fact rather than bother the Court of Appeals with something we think we can handle at the district court. They didn't do that. They didn't request that at all. So the idea that we should, you know, many courts, it's not just the Eastern District of Virginia, will combine claim construction and summary judgment in the same proceeding. And there's more than an adequate procedure if somebody gets surprised to request that they be given an opportunity to address the claim construction that they say they didn't anticipate. Thank you. Any more questions? Now, we do have to look at the evidence in the light most favorable to them, right? In your motion. And I think the key word in Your Honor's question is evidence, not attorney's argument. Thank you very much. Thank you, Mr. Wallace. Mr. Waldron, would you have another five minutes before we run over besides what's left? Thank you, Your Honor. In the district court, open that move for summary judgment against DS-65 patent based on this purported failure of MDOCs to identify DSD scripts. And they had a corollary argument that our expert was not an expert in DSD scripts, which is something that's unique to open that. And our response to that summary judgment motion, we identified evidence that showed that DSD scripts really are not the accused product. The accused product is this FusionWorks framework CD, which contains all of the code for performing all of the functions that's claimed in the MDOCs patent. We identified these foreign proposals. And yes, they're marketing materials. But they're 60, 70 page long, very detailed documents that describe the disk. The disk is common. That is an undisputed fact. And again, it was admitted by their CTO in his deposition. And we cite to that. The disk, that is the FusionWorks disk, is the same disk, whether it's delivered to a Canadian customer or whether it's delivered to a United States customer. So a document that describes that disk, whether it's to a potential Polish customer or to a Canadian customer or an African customer or anywhere in the world, is relevant and probative of what's on the disk. That's correct. The document describes the capabilities of the disk. And the capabilities are very clearly described. It's easier to understand, I submit for a jury, than source code. We did, though, from our expert, in response to their motion in which they said our expert's not an expert on DSD and she has not submitted any opinions on DSD, we submitted her reports in our opposition. We did not put in declarations. But we didn't feel that we needed to because, again, we were not accusing DSD as the infringing code. DSD is not code. It's scripts. It's not object code. It's not source code. It's not compiled into source code. So it's an easy line to draw here when you're looking at our claims. Code for collecting date records. Code for correlating records. Code for enhancing records. That's code that is on the disk. Those disks do need to be commanded what to do, just like your Microsoft system needs to be commanded to print. But that command, a print command, is not code. And if you sell the software, the underlying software, with those capabilities, and the claims cover software with those capabilities, then you're covered. Well, within the doctrine of capable of, if too much is required. For example, if you had to... If you had to rewrite the code, you'd be in trouble. But this is really a case of first impression, is we haven't seen a case where it might require some very complicated manipulation of the underlying code. Right. I think you're correct. I don't believe, though, this is a hard case. And again, because... If this case went to trial, you're certainly going to hear that from the other side, that even though the disk has the information in it, too much has to be done to it to allow you to take advantage of the capable of doctrine. Right. The jury is going to be able to find, as you note, though, that the code does not have to be rewritten. The capabilities are already on the disk. And as their CTO acknowledged, every command that is a possible DSD command, there is corresponding code on that disk that's waiting to perform the functionality in that command. DSD is a limited... Well, then there's the added question of whether or not the architecture can be created. I mean, it's two separate issues. One of the specific commands at the spokes, and the other is whether or not you're doing it at the spokes and then sending it home. And I would agree with that. And Mr. Wallace claims that we shouldn't have been surprised. And the only thing I can say to that is we were, and that's because OpenNet never raised the argument, either in non-infringement contentions or in an expert report or in summary judgment. Maybe they didn't raise the argument. Excuse me? Maybe you were surprised they didn't raise the argument. Well, that's not... I don't believe that's the correct... Because, again, the facts show that they do support distributed enhancement. And again, as the court understands that term. And with that, unless you have any further questions... Any more questions? No more questions. Any more questions? Thank you very much. Thank you. Thank you, Mr. Warren, Mr. Wallace. The case has taken a decision. Thank you.